NOTICE:  All slip opinions and orders are subject to formal
revision and are superseded by the advance sheets and bound
volumes of the Official Reports.  If you find a typographical
error or other formal error, please notify the Reporter of
Decisions, Supreme Judicial Court, John Adams Courthouse, 1
Pemberton Square, Suite 2500, Boston, MA, 02108-1750; (617) 557-
1030; SJCReporter@sjc.state.ma.us

SJC-13444

COMMONWEALTH  vs.  EMILIO DELAROSA.


Essex.     January 9, 2026. – July 21, 2026.

Present:  Budd, C.J., Gaziano, Kafker, Wendlandt, & Dewar, JJ.


Homicide.  Practice, Criminal, Instructions to jury, Request for
    jury instructions, Capital case.


Indictments found and returned in the Superior Court
Department on December 12, 2016.

The cases were tried before Salim Rodriguez Tabit, J.


Michelle Menken for the defendant.
Marina Moriarty, Assistant District Attorney (Kate B.
MacDougall, Assistant District Attorney, also present) for the
Commonwealth.


DEWAR, J.  A jury convicted the defendant, Emilio Delarosa,

of murder in the first degree for killing Wanda Rosa.  The

defendant admitted that he strangled the victim.  Seeking a

lesser conviction of voluntary manslaughter, the defendant

pursued a defense of heat of passion on reasonable provocation.

At trial, the judge denied the defendant's motion for a

voluntary manslaughter instruction at the close of the Commonwealth's case but allowed the motion after the defendant testified on his own behalf.  In this direct appeal, the defendant argues that the judge erred in initially declining to instruct on the lesser offense, thereby in effect forcing the defendant to testify in order to obtain the instruction.

We conclude that the trial judge did not err in denying the defendant's motion for a voluntary instruction based on the evidence admitted during the Commonwealth's case.  And, following review of the entire record of this case under G. L. c. 278, § 33E, we decline the defendant's request that we order a new trial or reduce the conviction to manslaughter.

Background.  1.  Commonwealth's case.  We recite the facts that the jury could have found, reserving certain details for our discussion of the issues.  The Commonwealth's evidence included an audio recording of a police interview of the defendant, in which he described the events preceding the killing, the killing itself, and his subsequent flight.

At the time of the killing in the early morning hours of September 12, 2016, the defendant and the victim recently had rekindled their on-and-off relationship of seven or eight years. They also had a son together who, at the time of the killing, was four years old.

Years earlier, the victim had obtained an abuse prevention order against the defendant with no-contact and stay-away provisions. In January 2012, after their son was born, the victim obtained a modification of the order so that it still barred abuse by the defendant but newly permitted him to contact and visit her and the baby. In May 2012, while the modified abuse prevention order still was in effect, the defendant physically attacked the victim -- including, among other acts, twisting her neck and suffocating her until she started to "see black" and bleed from her mouth -- and, against her will, drove her and the baby as far as New Jersey, where she obtained help at a gasoline station.[1] Following this incident, the defendant was imprisoned for four years, for which he blamed the victim, and the two did not communicate during this time.

After the defendant's release from prison, the defendant and the victim resumed contact with each other; although an abuse prevention order remained in effect, it did not contain no-contact or stay-away provisions. By September 2016, the defendant was staying at his sister's apartment in Lawrence but

---

[1] When this evidence was introduced, it was accompanied by an instruction to the jury regarding the limited purposes for which it could be considered. Cf. Commonwealth v. Hinds, 494 Mass. 681, 690 (2024), and cases cited (evidence of defendant's prior bad acts admissible to prove his animosity toward victims and nature of his relationship with them).

frequently visiting the victim and their son, who lived together in an apartment in Methuen.

On September 11, 2016, the victim was away from her apartment attending a class. While in the victim's basement folding laundry, the defendant discovered a letter that appeared to have been sent to the victim by another male inmate shortly after the defendant was incarcerated in 2012. The letter recounted a prior comment by the victim that the letter's author was "definitely" the father of her son, and it described the victim as "play[ing] with [the defendant's] emotions like a yo-yo" by telling the defendant that the defendant was the son's father. The letter's author stated that he was going to try to get a paternity test, but, regardless of the results, would "always alway's [sic] have love for [the victim] for all the things [they had] been [through]." Throughout the letter, the author disparaged the defendant, referring to him as a "maniac" with "a few cards missing in his poker deck," a "bad guy" who "hit [the victim]" when she was pregnant while "thinking it was his freaking kid," and a "Class A losser [sic]," among other derogatory terms. The letter also evinced familiarity with various members of the victim's family, and the author commented that the family must be relieved that the defendant was in prison, given their hatred for him.

The defendant told police that, although he wanted to confront the victim about the letter, he initially "didn't want to mention" it because he "knew she would . . . probably overreact."  After the victim returned home from her class, she and the defendant went to sleep with their son in the same bed. At around 3 A.M., the victim got up to use the bathroom.

Awakened, the defendant chose this moment to confront her. The victim responded, "Babe, what the fuck?"  The defendant then began strangling her with his hands.  The two fell to the floor, and he continued strangling her until she was unconscious, while their son, awakened, cried for him to stop.  Neighbors through the wall heard the victim's final words and the son's cries of "Daddy, no."

The defendant left the letter from the inmate by the victim's body.  He then left the victim's apartment, taking their son with him, and drove to his sister's apartment.  Around 4:30 A.M. that morning, the defendant's sister found the defendant standing in her kitchen.  Based on his strange behavior, she grew concerned and retrieved their mother from the mother's apartment upstairs.  The defendant's sister and mother then drove to the Methuen police station to request a well-being check on the victim, leaving the son in the care of another relative.

Police officers found the victim on her bedroom floor, covered by a blanket. She was unresponsive, and there was bruising around her neck. Following unsuccessful efforts to revive her, she was pronounced dead at a hospital approximately two hours later. The medical examiner who performed the victim's autopsy opined at trial that, based on the victim's wounds, she was strangled to death. Deoxyribonucleic acid (DNA) testing later confirmed that the defendant's DNA matched samples taken from the victim's neck.

The defendant fled after his mother and sister left the sister's apartment to go to the police station. Approximately one year later, police located him in California, where he had been taken into custody. The defendant then waived his rights under Miranda v. Arizona, 384 U.S. 436 (1966), and confessed to the killing.

2. The defense. The defendant sought to persuade the jury to convict him of the lesser offense of voluntary manslaughter on the theory of heat of passion on reasonable provocation. He argued, in essence, that he reacted instinctively, overwhelmed by anger at both the revelations in the letter he had discovered -- that the victim had been unfaithful, and that another man had fathered the son the defendant had believed to be his own -- and the victim's response when he confronted her with the letter. The defendant initially sought to present these arguments

without testifying himself.  But after the judge ruled, for reasons we shall discuss, that the defendant was not entitled to a voluntary manslaughter instruction based on the evidence admitted during the Commonwealth's case, the defendant testified in his own defense.

The defendant's testimony elaborated in a number of respects on his account of the events in his recorded statement to police.  He described how, prior to the victim's pregnancy with their son, he had struggled with infertility and did not believe he was able to have children.  Although he had obtained a paternity test showing that he was the son's father, the testing provider had told him the results might not be admissible in court, leaving lingering doubt in his mind about the results' veracity.

On the night of the killing, although the defendant wanted to speak with the victim about the letter he had found, he decided not to confront her when she came home, because they were having a "good conversation," and it "didn't feel . . . appropriate" to raise the subject then.  When he did confront her in the middle of the night, she admitted that she was unsure who was the father of her son, and she accused the defendant of fabricating the prior paternity test results.  When the defendant suggested obtaining an official test through the courts and then changing the son's last name to his, the victim

began yelling aggressively and declared that the defendant was not the father, and the child would "never be [his] son."  In response, the defendant "snapped" and began choking her without realizing what he was doing.  He "came to" when his son held his hand and told him to stop.

3.  Prior proceedings.  On December 12, 2016, a grand jury indicted the defendant for murder.  The jury trial began on January 26, 2023, and concluded on February 2, 2023.  The Commonwealth proceeded on theories of murder committed with deliberate premeditation and with extreme atrocity or cruelty. Although the judge declined to instruct the jury on voluntary manslaughter at the close of the Commonwealth's case, he concluded at the close of all the evidence that such an instruction was appropriate based on the new details in the defendant's testimony, including that, just prior to the killing, the victim accused the defendant of fabricating the prior paternity test and then yelled aggressively that the son was not his and never would be.

After being instructed on the two theories of murder in the first degree, murder in the second degree, and voluntary manslaughter on the theory of heat of passion on reasonable provocation, the jury found the defendant guilty of murder in the first degree committed with extreme atrocity or cruelty.

The judge sentenced the defendant to life in prison without the possibility of parole.  This timely appeal followed.[2]

Discussion.  1.  Voluntary manslaughter instruction.  The defendant's principal claim on appeal is that the judge erred in denying him a voluntary manslaughter instruction at the close of the Commonwealth's case.  Because the defendant preserved the issue, we review the judge's denial of the instruction for prejudicial error.  See Commonwealth v. Escobar, 493 Mass. 694, 708 (2024).[3]

The judge was required to instruct the jury on voluntary manslaughter at the defendant's request based on the evidence admitted during the Commonwealth's case "if, on any view of the evidence, regardless of [its] credibility, manslaughter may be found" (quotation omitted).  Commonwealth v. Acevedo, 446 Mass. 435, 442-443 (2006), quoting Commonwealth v. Carrion, 407 Mass.

---

[2] The defendant also was indicted for and convicted of violating the abuse prevention order that the victim had obtained against the defendant, and he received a concurrent sentence of two and one-half years for the offense.  The defendant has not presented any argument challenging this conviction on appeal.

[3] The defendant argues both that the claimed error caused him prejudice and that it amounted to a constitutional violation that was not harmless beyond a reasonable doubt, because the ruling in effect compelled him to testify contrary to his right not to do so.  Concluding as we do that the judge did not err in denying the requested instruction at the close of the Commonwealth's case, we need not reach either argument.

263, 266-267 (1990). We therefore view the evidence in the light most favorable to the defendant in determining whether such an instruction was warranted. See Acevedo, supra at 443.

"Voluntary manslaughter is unlawful homicide arising not from malice, but 'from the frailty of human nature,' as in a case of 'sudden passion induced by reasonable provocation, sudden combat, or excessive force in self-defense.'" Commonwealth v. Bins, 465 Mass. 348, 368-369 (2013), quoting Carrion, 407 Mass. at 267. "Reasonable provocation 'is provocation that would have been likely to produce in an ordinary person such a state of passion, anger, fear, fright, or nervous excitement as would eclipse his capacity for reflection or restraint'" (quotation omitted). Commonwealth v. Fratantonio, 495 Mass. 522, 530 (2025), quoting Bins, supra at 369. To warrant a jury instruction for voluntary manslaughter based on reasonable provocation, "[t]he evidence must be sufficient to create a reasonable doubt in the minds of a rational jury that a defendant's actions were both objectively and subjectively reasonable." Fratantonio, supra, quoting Commonwealth v. Groome, 435 Mass. 201, 220 (2001). In other words, "the jury must be able to infer that a reasonable person would have become sufficiently provoked and would not have 'cooled off' by the time of the homicide, and that in fact [the]

defendant was provoked and did not cool off."  Fratantonio,
supra, quoting Groome, supra.  See Acevedo, 446 Mass. at 443.

"In general, words alone are not sufficient provocation,"
because "a reasonable person can be expected to control the
feelings aroused" by "verbal insults and arguments, even if
obscene or hostile" (quotation and citation omitted).
Commonwealth v. Ronchi, 491 Mass. 284, 292 (2023).  An exception
exists, however, for statements that "convey inflammatory
information" and "constitute a peculiarly immediate and intense
offense to [one's] sensitivities" (quotation and citation
omitted).  Commonwealth v. Mercado, 452 Mass. 662, 671 (2008).
For example, at the time of the defendant's trial, "a defendant
could pursue [a reasonable provocation] defense based on
evidence of a 'sudden discovery of present spousal infidelity,'
including discovery by means of a sudden oral admission of
adultery" (citation omitted).  Fratantonio, 495 Mass. at 530.[4]

The defendant argues that the judge was required to give a
voluntary manslaughter instruction based on the evidence

---

[4] After the defendant's trial, in Ronchi, 491 Mass. at 295,
we held that, "[g]oing forward, we no longer will recognize that
an oral discovery of infidelity satisfies the objective element
of something that would provoke a reasonable person to kill his
or her spouse."  But we did not "foreclose the possibility of
sufficient provocation caused by learning of other types of
information of a nature to cause a reasonable person to lose his
[or her] self-control" (quotation and citation omitted).  Id.

presented during the Commonwealth's case, because the jury could have found reasonable provocation on either of two grounds. First, the defendant contends that his discovery of the letter alone amounted to reasonable provocation; in inflammatory terms, the letter revealed the victim's intimate relationship with another man and the victim's doubts about the defendant's paternity of his son. Moreover, the defendant contends, his recorded statement to the police showed that he in fact was provoked by the letter. And, although there was a gap in time between his discovery of the letter and the killing, the defendant argues that the provocation was so intense that a reasonable person would not have cooled off during the intervening period, and the defendant's statement showed that in fact he had not cooled off. Second, the defendant alternatively argues that, even if he had sufficient time to cool off after discovering the letter, the victim's conduct just prior to the killing also amounted to reasonable provocation.

We discern no error by the trial judge. With respect to the letter itself, even assuming without deciding that a reasonable person would have been provoked by its contents and that the defendant in fact was provoked, under "any view of the evidence" (citation omitted), Acevedo, 446 Mass. at 442, a reasonable person would have cooled off from any heat of passion induced by the letter by the time of the killing. By the

defendant's own account of the events in his statement to the police, not contradicted in these respects by the Commonwealth's other evidence, the defendant discovered the letter while folding laundry in the victim's basement, later went to sleep in bed beside the victim and their son, and did not confront her with the letter until they woke in the middle of the night. Even viewing the evidence in the light most favorable to the defendant, following this course of events, "no reasonable person would have remained provoked and not have 'cooled off' at the time of the stabbing." Commonwealth v. Gonzalez, 465 Mass. 672, 687 (2013). See, e.g., id. at 686-687 (voluntary manslaughter instruction unwarranted where, although precise amount of time following claimed provocation was unclear, defendant packed clothing and spent time in different room alone before returning and stabbing victim); Commonwealth v. Smith, 460 Mass. 318, 325-326 (2011) (where defendant "engaged in ordinary activity" after claimed provocation, later attack on victim "was not the result of an immediate and emotional eruption" as matter of law, despite silent record regarding length of time between provocation and attack).[5]  Because the

---

[5] The defendant contends that the judge failed to view the evidence in the light most favorable to him with respect to the length of time that passed between the defendant's discovery of the letter and the killing; although the judge referred to "hours and hours" as having passed, the defendant contends that, based on the limited evidence regarding the timeline, the length

defendant's actions thus were objectively unreasonable based on the evidence presented during the Commonwealth's case, he was not entitled to the voluntary manslaughter instruction, regardless of whether he in fact had cooled off by the time of the killing.  See Fratantonio, 495 Mass. at 530.

We are not persuaded to conclude otherwise by the defendant's reliance on Commonwealth v. Andrade, 422 Mass. 236 (1996).  There, the defendant confirmed his wife's infidelity, had "a comparatively amicable discussion of their situation" with her shortly afterwards, fell asleep, and subsequently killed her at least seven hours after the initial confirmation. Id. at 238, 240.  Although we noted that "voluntary manslaughter was a possible verdict, although an unlikely one," id. at 237, the issue of whether a voluntary manslaughter instruction was required in the circumstances was not before us; the judge had given the instruction, id. at 238.  Moreover, elsewhere in the opinion we noted the "dearth of evidence tending to show that the defendant had lost control of himself on the night of the killing and acted in the heat of passion."  Id. at 241.  To the extent that Andrade could be understood to suggest that a

---

of the intervening period was "indeterminate."  Deciding the case as we do based on the events that undisputedly transpired during the intervening period, we need not consider the issue.

voluntary manslaughter instruction was required in the circumstances presented here, we disavow the suggestion.

We also reject the defendant's argument that, even if he had sufficient opportunity to cool off following his discovery of the letter, the evidence in the Commonwealth's case regarding his confrontation with the victim just prior to the killing provided grounds for giving the requested instruction. In his police interview, the defendant described the victim as having "snapped" when he confronted her with the letter and asked her if she was "really confused about who [the son's] father was," and the son, in his testimony, described the defendant as becoming "louder" and "angry" in response to a statement by the victim. The defendant also stated that he strangled the victim out of "instinct" and "with a lot of anger" that was "overwhelming"; that he "wasn't conscious of what [he] was doing" but at one point asked the victim why she "ha[d] to lie and put [him] through this"; and that "reality started kicking in" only when his son told him to stop. The defendant argues that a jury reasonably could infer from this evidence that the victim's "words and actions conveyed to [the defendant] that [she] had lied about [the son's] paternity." As the judge correctly concluded, however, there was no evidence that the victim conveyed new inflammatory information to him to justify an exception from the general rule that mere words do not amount

to reasonable provocation.  See Mercado, 452 Mass. at 671.

Although the jury reasonably could infer from the evidence that

the defendant and the victim argued over the contents of the

letter, which raised questions about the son's paternity, the

jury would have had to speculate as to any "sudden" revelation

by the victim during the argument that differed from the

information in the letter discovered earlier.  Id.  See Ronchi,

491 Mass. at 293 (because discovery must "comprise sudden

knowledge[,] an actual confirmation of a suspicion of infidelity

is not sufficient").  See also Gonzalez, 465 Mass. at 686

(voluntary manslaughter instruction unwarranted based on "mere

speculation" as to provocation by victim); Groome, 435 Mass. at

220 ("judge may not charge on a hypothesis not supported by the

evidence" [citation omitted]).  The judge therefore did not err

in declining to instruct the jury on voluntary manslaughter

based on the evidence admitted during the Commonwealth's case.

2.  G. L. c. 278, § 33E.  We have reviewed the entire

record of the case pursuant to our duty under G. L. c. 278,

§ 33E.  We discern no basis to exercise our authority to reduce

the verdict or order a new trial.[6]

---

[6] In arguing for relief under G. L. c. 278, § 33E, the
defendant briefly contends that the prosecutor's cross-
examination of the defendant included two improper lines of
questioning.  These questions, to which the defendant did not
object, concerned (1) whether injuries visible around the
victim's eyes in a photograph taken in connection with the prior

Conclusion.  The trial judge did not err in denying the defendant's motion for a voluntary manslaughter instruction at the close of the Commonwealth's case.  Following our review of the record under G. L. c. 278, § 33E, we affirm the judgments.

So ordered.

---

2012 incident were consistent with strangulation, and (2) whether the victim's affidavit in support of the application for an abuse prevention order alleged that the defendant had made various threats to the victim.  Even assuming without deciding that these questions were improper, they did not create a substantial likelihood of a miscarriage of justice in the circumstances of this case.